and others, number 5-9-383. And Mr. Keene, whenever you're ready, sir, you may proceed. If the Court please, this is the second time we've been back on the same case, the Court having originally entered the Rule 23 Order of September 19, 2005. The original suit was by Feather River Rail Society, which is a California corporation, which has a railroad museum in Portola, California, against Kasten and Illinois Transit Assembly Corporation overpurchased from them of a historical railroad passenger car, which was a Vista-domed car called the Silver Hostel, which had run on the California Zephyr, which was a historical railroad train that used to run in the west. The plaintiff alleged breach of contract, conversion, and fraud, and I'm going to contend, not contend, but assert that all that's left is conversion. The original trial court, in a summary judgment by Judge George Moran, Jr., entered summary judgment against the defendants for over $800,000. $750,000 of which was punitive damages, $30,000 in actual damages, $9,000 in expenses, and $35,000 in attorney's fees, based upon the failure of the defendant, Kasten, to respond to a request to admit. The defendant appealed, and if I can, Your Honor, I'd like to recite the series of events that have happened since then before I give a brief resume of the facts, because I think it makes sense if I do it that way. The defendant appealed, and in the Rule 23 order of this Court, this Court reversed in part and affirmed in part and ordered a new trial on the issue of whether there were actual damages sustained in conversion. That was the key to the case, and for the trial court to consider the amount and propriety, in the words of this Court, of the amount of the judgment on conversion. The appellate court found there was a conversion, and that is not an issue here. That's written in stone. There was a conversion. That's not the question. The question is whether or not the plaintiff sustained damages and is entitled to either punitive damages or attorney's fees. The plaintiff, or the appellate court, did not return the contract or fraud counts for retrial. Since plaintiff didn't request actual damages in the fraud counts, they couldn't recover either actual damages or punitive damages, and the contract counts, this Court simply let those counts stand and awarded no damages to the plaintiff as far as the contract counts were concerned. It was pointed out by the trial court when the case was in trial that the fact was that this Court awarded $0.00 to the plaintiff in the contract counts when they came back down and urged the plaintiff's counsel that if he had wanted to contest that, he should have filed a petition for leave to appeal the Supreme Court, which was not done. That appears at record 63 in colloquy between the Court. Ultimately, according to the order of this Court, a bifurcated trial was held in February 2008 for three or four days in Madison County. Nine months after the trial was held, Judge Clarence Harrison, who was the trial court judge, entered a judgment for the plaintiff for $35,000 in actual damages and $70,000 in punitive damages. And presumably because Illinois cases have consistently held that attorney's fees are not awarded in conversion, added no more damages, the total there then being $105,000, so he dropped from $800,000 to $105,000. Post-trial motions were filed, and seven months later, the trial court judge Harrison changed his whole original judgment of November 2008 dramatically. And he then changed it from that $105,000 to $35,000 in actual damages and $160,000 in attorney's fees to the plaintiff. Plus $5,000 in punitive damages. And it could be argued facetiously that it's a fair and evident result to have punitive damages reduced to $150,000 to $5,000. But nonetheless, that occurred, and that's on the record right now. The question is whether or not the plaintiff sustained $35,000 in damages, because while this Court ruled that there was a conversion, this Court did not rule and specifically sent the case back to the trial court to determine if there were actual damages sustained by the plaintiff in this case. The only – which was the only thing – and we argue that if the trial court did rule that there were $35,000 in damages, that's almost totally mitigated by the fact that the plaintiff still has the so-called trucks which were installed on this railroad car at its museum in California on display, on permanent display, and they have stempled around Cass's certification, his certification that painted the rest of the trucks silver, and it's on permanent display for the public. The question is further that whether or not the car was – well, the car was transported legally under federal FRA rules to California and under the certification of ITAC, and the plaintiff said that they were going to replace these trucks that had been shipped to California. In point of fact, the two points in the record, including the letter from Plaintiff's counsel, which is marked as in Appendix 25, the plaintiff's counsel, the then-plaintiff's counsel, Mr. Kevin McCabe of Lord Bissell and Brooks said that they had obtained replacement trucks for those trucks, and in point of fact, they did not. And in another point, Mr. McCabe indicated in a pleading, page – paragraph B on A5 of his memo in support of his judgment that they had gotten replacement trucks for the trucks that Mr. Castner had supplied to California when they never – when in fact they never did. Those trucks are still sitting out there in California. The question are the issue of whether or not the attorney's fees, which are now over five times the actual damages, and presumably there's going to be more, are, number one, even allowable under Illinois law and national cases in conversion, which we contend they are absolutely not, and number two, are the $160,000 in attorney's fees grossly excessive under Illinois law, even if they could be allowed in conversion, which they can't under Illinois law. Number three, should punitive damages of any kind be allowed, and number four, did plaintiffs sustain any damages in conversion since the defendants had installed on this car perfectly operating, historically accurate trucks identical to the ones that had run on other cars on the Silver – on the California desert? And I should have said – and I should have said these are dome cars that are – that were used historically for these special routes that were taken around the country. In any case, and the question is – and they were identical to the ones he put on there were identical to the – and perfectly operating California desert type cars. If the court please, a brief resume of the facts. I apologize for going into that series of events involving the pleadings because I think that they're extremely important when you come to the issue of what actually happened. Kasten and ITAC operated in Madison County. It's now dissolved. Kasten now lives in Minnesota. ITAC and Kasten were dealers and restorers of historical railroad passenger cars, especially these dome cars that were used in the Canadian Pacific and used in the California Zephyr and so forth. They offered for sale a car called the Silver Hostel. The car was shipped on a flatbed car from Denver to Madison County, Illinois, and it was put on trucks, so-called trucks. And this is the wheel assembly under the car. And those trucks had been damaged in a 90 mile per hour derailment down in North Carolina. Kasten knew that he couldn't ship the car on that particular truck. The plaintiffs sent two inspectors, a Mr. Morgan and Vic Mayer, to Madison County down to Madison Yard of Kasten, and they inspected the car and the trucks, and both of them said that the trucks in the car appeared to be in good condition and that the trucks were suitable for transport of the railroad car. They were dead wrong about that, and those trucks had been severely damaged in a derailment. Kasten knew that they were completely wrong, and it would have been illegal under FRA rules to have shipped the car with the trucks that were on there, these severely damaged trucks. So what he did, a full month before the contract between the parties, which is a purchase order, was signed, he sent a fax to Mr. Morgan, one of the two inspectors that came down and who was a designated agent of the plaintiff, to the effect that those trucks were going to be replaced with trucks from a car called the Silver Dollar. And that car was an identical car to the California Zephyr cars, including the Silver Hostel, which had been used in Western service with these Vista-dome cars for many years. No one of the plaintiffs in trial denied that that fax was received, so it was endowed to receive. Mind you, he did this a full month before the contract was signed, and he did this a full month before the plaintiff paid for the car. So what happens then, and he prepped and installed these trucks, which were perfectly suitable for transport over the Amtrak trucks, over Amtrak rails to California, and it was transported there and it's sitting in the museum right now with these perfectly historical… I understand you're resigning the fax, but you'll agree with me, won't you, that the issue of liability for conversion was determined in the previous appeal? Yes, and this, however, if Your Honor, if the Court please, goes to the issue of punitive damages. All right. The issue of liability was established, and it more or less, I think, it can be agreed, I think, by all the parties that the actual damages which were set by the original trial court, by Judge Harrison, were $30,000 to $35,000, okay, something around there. But what we say is if that's the case, then Cassett is entitled to either mitigation, set off, or to return of the trucks, which he sent to California. I hope that adequately answers the question. Five months later, on 24 hours' notice, Morgan called for the plaintiff and said that they were picking up the car the next day. Cassett worked overtime through 24 hours putting on the perfectly operating silver dollar trucks, and the plaintiff transported it to California, where it's on permanent display and has been all this period of time. This case had started in 1999, and here we are in 2010 with Cassett's certification of the ability of the truck to travel over Amtrak trucks. On those cars, stenciled around, in other words, they left that. We state that the plaintiff was not damaged in any way financially, that the plaintiff, excuse me, that the plaintiff has perfectly operating California Zephyr trucks identical to the original California Zephyr trucks, which in this issue goes to the matter of punitive damages, not to the issue of actual damages, if the court please, according to the court's question. And if the plaintiff did, under trial court's ruling and this court's ruling, sustain $35,000 in damage, it means that the replacement trucks, which Cassett sent out to California, belong to him. I made a correction in the reply brief, by the way. I thought I had a duty to do it, in which I had said that the plaintiff had not asked for damages in the contract in its original pleadings when, in point of fact, it did. However, that's obviated by the fact that both the trial court and this court awarded no damages in contract when the case was tried, when it was here. And the only thing we'll hear on, according to the court's ruling and its Rule 23 order, is the issue of, number one, there was a conversion. Number two, were any damages sustained? Number three, were there any possible punitive damages? And number four, were there attorney's fees to be awarded? We argue that attorney's fees can't be awarded in conversion under every Illinois case and under the national authority on the subject, and that the plaintiff sustained at most the $35,000 to which it's entitled to mitigation. American Peru prevails on the issue of attorney's fees in conversion, as the court well knows, unless there's a special agreement or a statute. There was no special agreement. I cite Maynard v. Parker, plus many other Illinois cases, plus all the cases in Trover Conversion and Corpus, all the cases in Illinois Digest, all of them say no attorney's fees in conversion. And that's just the way it is. Likewise, jumping back a bit, there's no punitive damages in contract. But the contract case is gone. It's out of the case, and as this court said, we're here on the conversion. The trial court said that the attorney's fees could be based upon, quote, broad contract language. Under this, the fees would have to be based on the contract violation. The contract counts are gone. And this is dead wrong. The contract counts are gone, as I said. The trial court also said that attorney's fees can be an element of compensatory damages. Your Honor, with due respect to Judge Harrison, there's no law of any kind in the state of Illinois which says this, that is, that attorney's fees can be considered as an element of compensatory damages. Attorney's fees are always separate. They're always separate under Illinois law. On the issue of fees in the original appeal, we contend in our brief somewhat extensively, I think, that the defendants were the ones who prevailed in the appeal. Therefore, the plaintiff should not be awarded attorney's fees in the appeal when the defendants were the one that got the judgment reduced from $800,000 down to the level it is now. There's Illinois law on that which is mixed, and you can go back and forth on the subject. But we contend as a practical, common-sense matter that we should not be charged for the defendant's appeal when the defendant effectively had his judgment reversed. And it just doesn't make sense that that should be the case. On punitive damages, this Court has held repeatedly that there must be egregious contact, willfulness, malice, oppression, and so forth. And in the confirming opinion in this Court, that was reiterated in indicating that willful, wanton behavior or misconduct was required for punitive damages. There was nothing like that. Chaston went out of his way to make sure that they got perfectly operating trucks suitable for this car, identical to the ones operated on the California Zephyr, and took steps over 24 hours' notice to get them on the car, get them transferred to California, or they're on permanent display out there. I should have said, I think I said in the beginning if we didn't touch upon it, that on the request to admit issue upon which liability was found in the beginning on the summary judgment, that the vision point of sale contact, a case from last fall, has become very important. I won't touch that except briefly except to say that Judge Harrison ruled that as of the time the decisions were made in this case that the rule of the case provides. I still want to make a record on it because vision point, as you know, dramatically changes the subject on request to admit. I urge that it's applicable in this case, but I also make a record on it. The defendant's request, and I'm finishing now if the court pleads, that this court reverse outright the 2008 trial court judgment and find that the plaintiff sustained no damages, or if it did sustain $35,000 in damages, that it should get its trucks back, which I repeated repeatedly, but the trial court wouldn't entertain that motion. That there should be no attorney's fees allowed. It's not allowed in conversion under Illinois law, and in both the international cases on the subject, and that there should be no punitive damages awarded even though they were reduced $750,000 to $5,000 because there was no indication of any kind of willful, egregious conduct which would give any basis for the awarding of punitive damages. So I have made my statement on the subject, and I believe that it's fair to say that this case is full, and this doesn't advantage me by saying it. It's full of anachronisms, if you want to, and full of twists and turns and applications of the law. And, of course, it's complicated by the fact that it's gone on for 11 years. It's complicated by the fact that the defendants come back here with having had their judgment reduced from over $800,000 down to $200,000, which they contend is still too much, and we urge, the defendants urge the court to grant the statements and requests that I simply made in terms of the relief which we see in this appeal. Thank you very much. Thank you, Mr. King. Mr. Boyle. Thank you. May it please the court, my name is Richard Boyle, and I represent Feather River Rail Society, which is a museum in Portola, California, that involved with taking, with getting old railroad equipment, and this particular project that Mr. King referred to is the California Zephyr Project, where they're trying to collect all of the California Zephyr cars and other proceedings. This case is almost 10 years old, and the litigation is 10 years old. Since the appellate court issued its Rule 23 order in September of 2005, Mr. King and I have always had disagreement about what the meaning of the Rule 23 order was, and a different interpretation. Fortunately, Judge Harrison agreed with my interpretation of it, and after numerous hearings and numerous motions and a three-day trial, decided the case, and then on post-trial motions by both sides, re-examined his earlier opinion concerning attorney's fees and decided that paragraph 12 of the agreement between the parties, which was entered into on May 12, 1999, was, would grant attorney's fees, contractual attorney's fees, and therefore entered an order, or amended this earlier order, and allow attorney's fees, but at the same time reduce the amount of punitive damages from $70,000 to $5,000. Factually, what we have basically is, in this case, was a lawsuit because of a conversion, or actually a theft, by the defendants of property that was owned by the plaintiff. The Rule 23 order is clear in that regard, and the Rule 23 order is the law of the case. Mr. King is not correct that the contract is out of the case, the breach of contract is out of the case. What the appellate court said, and Judge Wilson and Judge Donovan both were very familiar with it, that there would be, that they considered the case on the basis of the, what was before them was the summary judgment. The whole case wasn't before them because the whole case hadn't been tried. There was summary judgment that this court determined in the Rule 23 order. This court determined that based upon all of the admissions of the plaintiff, and that's pretty clear in the opinion, on all of the admissions that were made, then the plaintiff of the, on the part of the defendants, the plaintiff was entitled to judgment, to liability judgment on each of the seven counts of the complaint. The court affirmed the trial court's order granting judgment on breach of contract, on fraud, and on conversion, and all the other allegations of the complaint. Before the appellate court on the damages issues was damages for conversion. And, but that did not eliminate any trial as it went back to the trial court, and Judge Harrison inherited this case and had it for five years. As it went back to the trial court, all the issues of all the other issues on a bench trial would be before the court. During the trial proceedings, we presented evidence for compensatory damages on the basis of what the, of what damages would be for conversion. Because, as the Rule 23 order stated and held under the Jensen case, which is a Supreme Court case concerning what damages are available for conversion, the court, it is pretty obvious that, and I don't think there's any contest on it, but the damages for conversion is the value of the property at the time of the conversion plus statutory entitlement. At the trial, the Rule 23 order, although affirming all liability on all of the counts, including conversion, fraud, and breach of contract, reversed as to compensatory damages under the theory that the only evidence that was presented in the summary judgment papers was an affidavit. An affidavit by the defendants stating that they told the plaintiff that the value of the trucks that they took was worth $30,000, and the court said that that is evidence of what was said, but not evidence of the actual value. So on retrial, so the court then said that they would reverse it on the basis of the damages and send it back to the court for a determination of the compensatory damages. They also said that since there was no finding at that time of compensatory damages, there could be nothing on which you could base punitive damages, so punitive damages would also be decided by the trial court. And Judge Harrison, in his ruling, in various rulings, and not contested in the papers that the defendants have filed here, ruled that while the appellate court had said that there is punitive damages, they found fraud. They found that the defendants had intentionally and with premeditation intended to take these trucks and deprive the museum of the actual trucks that they want, which were the trucks that were on the Silver Hostel at the time of its use, and deprive them of that. So in the various hearings that was held before Judge Harrison, and there were many, many hearings and many motions, and defendants filed motions to reconsider, and all of which created a lot of attorneys fees, and he decided that taking the evidence that there was sufficient evidence and found that the compensatory damages for conversion of the valley would be worth $35,000. What do you have to say about Mr. Keene's assertion that his client should receive some type of offset or the return of the trucks that were placed on the railroad car? There is no, and Judge Harrison, that was briefed extensively. I notice in the appellate brief, I don't see any citations of any cases, but there is no law that would require that there is a set-off, and Judge Harrison ruled improperly so that there was no set-off for conversion. It's the type of thing, if a thief leaves property to hold up property that you steal, the thief wouldn't be able to get that offset from the property that he left, because the damages for conversion are only the value of the property plus the interest. Now, there's been no lawsuit. He's filed in the trial court a claim that we have to return the property, but if he files such a lawsuit, that would be a separate matter that would not be before this court. Does that answer the question, Judge? Was there any, the idea that the trucks are still on the car, I don't understand that part, how that got in as evidence. That it's still on the car? That it's still on the car, or you say they're not on the car. No, no, the replacement, there's two trucks, there's the reels that are. The older style. That has been admitted by defendants are more valuable than the trucks that they put on. No, no, the question is how did they get into evidence, the ones that are on it now, after the fact, are the same ones that it was shipped on. The trucks were put on it and shipped to California, those are still on it, apparently. How did that get into evidence? Well, that was testified to by. On this later hearing? At the later hearing, yeah. Yeah, we had the president of Feather River, which incidentally, Feather River is a non-profit organization of about 1100 members. There are 30 of these members that devote their time to do this. And two of them came out for the trial. So, anyway, the issue, and I must, I don't really know that I totally understand what the basis of, or what the basis of this appeal is. And in my brief of appellee, I tried to set forth the standards of review and what I felt would be the issues before this court. I have one more question. On the prove-up of damages, was the prove-up to try to prove up the trucks that were the damaged trucks that were originally viewed on the car? Or what replacement trucks would cost? Should you buy, I guess they're Timken trucks, I don't know. Well, the damaged trucks, what they claim to be the damaged trucks. Oh, you're saying they're not damaged trucks. No, they were Amtrak trucks. They're what we bargained to buy. And under the admissions, all that remains clear. So your argument was, in trial court, that the trucks that you originally looked at were not damaged trucks? That's correct. They were not damaged trucks. Do they have numbers on them or anything that were put into evidence? Yeah, there are numbers on the trucks, but they were the trucks that were bargained for. And you see, the crux of the matter is, the admissions that were made by reason of the fact that the demands to admit were not answered clarified all of this. And there can be no evidence that would contradict. In other words, they could still be damaged trucks, but they weren't answered, so you have to assume they weren't. Yeah, we have to assume that they weren't. Okay, but they might be. We're going by the evidence. Okay, that's what I mean. Yeah. And the evidence is that they were not damaged, that they were what we bargained for, and that they were better, a lot better than the replacement trucks that they took off and put on. And that's the... Now, is there any question that was brought up that they're not of the right vintage? Are the replacement trucks, the ones that were shown on the car at first, were not of the proper vintage of the car? No. What was shown, my people examined the car in about... Ten years ago. Yeah, maybe more. 1998, whenever it was, right before the contract was entered into. And they examined the truck. It had Amtrak trucks on it. I know, but those Amtrak trucks, was there even Amtraks when that car ran? Was it even Amtrak train? Well, it is called Amtrak. The Zephyr is not an Amtrak train, is it? Yeah, but they called them Amtrak trucks. I know, so that's... The reason they called them Amtrak trucks is because they were Amtrak qualified to run on Amtrak. But those were the trucks that the people wanted and what they bargained for, because they were the trucks that were on the car at the time. They looked at it. Yeah, they looked at it. And under the admissions that we have attached in the brief, they looked at it, they verified that those were the trucks. And then it's also admitted that they were taken off one day before... I understand that. I understand. My question is, it's sitting there with Amtrak trucks when they looked at it. But it never ran in its life, probably, except to get it there. I don't know how it got there. It got there on a flatbed, flat car. But it never had those trucks when it ran as the Zephyr. Is that correct? No, under the admission... That type. That we call Amtrak trucks that were taken off. Right. Okay, those trucks were under the admissions good and suitable and capable of being... I understand that. No, I'm saying did it ever run with those in its day? Or did it run with the trucks that it's got on now? Type. The type of truck that's on it now, were they the type of truck it ran on when it was the Zephyr? I can't answer that. I don't know. In other words, what I'm getting at is if they take those trucks off and put the, what you call Amtrak trucks, it would not be historically correct. No, our people, under the evidence, the trucks that are on there now are not historically correct trucks. There's a dispute about that. That's what I'm getting at. Yeah, there's a dispute about that. No, under the evidence that we presented, the trucks that are on there now are not the Amtrak trucks. I know that. They would prefer to have the trucks that were on the car at the time it was actually in service, which they took off. Which they, when they took off, they said Amtrak trucks. And that would have been on it when it was in service. I doubt if there was even an Amtrak when it was in service. It might have been. But that's just what they call the trucks. I understand that. And I don't know what, I mean, that was never an issue. That was never really brought up about what the terminology was. But under the Rule 23 opinion, they called them Amtrak trucks and replacement trucks. Right. Now whether how the Amtrak name got there, I don't know. But all we know is that the trucks that we tried to buy, that we were going to buy, were taken off intentionally by the defenders. There was some argument, I understand, that somebody did or did not see the email that said that they were putting the other trucks, or the trucks were not safe or whatever, would not be authorized by Amtrak. It would be a violation to run them. That's what they're contending. And so you're claiming that. We can contend that that should never be in the case because of the judicial admissions that the appellate court approved. On the default. Yes, exactly. Now that might go, I think as Judge Harrison said, that might go to some issue of punitive damages. But not certainly to the other issues involved here. And the big issue, it seems to me, that is that. Well, in other words, you're saying it might be true, but it doesn't matter because it was defaulted out in the 23. Exactly. Exactly. And it's the law of the case, and it was the evidence. Now, the issue is, Mr. King said that there's no punitive, no attorney's fees or expenses can be awarded for an action for conversion. Well, there could be. The only time you have attorney's fees and expenses is either by statute or by contract. Judge Harrison didn't award them on the basis of the fact that it was conversion alone. He awarded them on the basis of paragraph 12 in the contract. And the paragraph 12 says, the parties under this agreement agree that in the event any action is taken, whether by suit or otherwise, to enforce the agreement, the prevailing party shall be entitled to recover that party's costs and expenses. Judge Harrison ruled, in accordance with a case from this district, the Esker case decided by Judge Goldenhurst that I cited, that the prevailing party is a party that wins. And you don't have to win on every single issue to be a prevailing party. So he was absolutely correct in his ruling on the contractual provisions allowing attorney's fees and expenses. The other issue that I think that they brought up, at least they did during the trial, was that, well, since it's a conversion action and damages were issued in connection with conversion, that then the contract wouldn't apply. But in the Ellenbush case that I cited, that was an action that involved a real estate contract. And they didn't sue on the real estate contract that had the fee-shifting provision in it. They sued just strictly on fraud. And the court in Ellenbush said that that's okay, the contract still applies because the court can still take the fee-shifting provisions in the contract and apply it because there was an action to enforce the agreement that was existing on the basis of fraud. So under any scenario of their argument, as I try to point out in the brief, the trial court was absolutely correct in doing what it did. On the original appeal, there was no discussion of the fact that there was no judgment on the contract counts. It came up. There was nothing on the contract counts coming up. But in the original appeal, in Rule 23 order, the court said that judgment is affirmed on all counts, including contract counts. And we find that plaintiff is entitled to judgment in favor on counts 4, 5, and 6 on page 8 or page 89, and also coincidentally, but incidentally, page 9 of the Rule 23. Are you looking at the last page? No. Earlier in the opinion is where the court says that summary judgment was affirmed on all counts for liability. Well, the summary judgment was only entered on certain counts, though. Was the summary judgment entered on the contract count? Yes. Summary judgment was entered on liability in the contract count. I think I know that by now. Damages were only determined under the conversion count. Of course, obviously, the reason for that, conversion count damages are a lot easier to show. You just show the value of the property at the time of conversion and the interest rate. Any other questions? All right. Thank you, Mr. Boyle. And any rebuttal, Mr. King? Thank you, Your Honor. You can't recover the attorney's fees on conversion in Illinois, and the court was quite correct in saying, pointing out, the contract counts were gone, the judgment was found, and page 8, as the court properly indicated that. Did you try to distinguish that Erlin Bush case in your reply brief or in your brief? That one there is mentioned in there, and it's distinguished, if you please. I don't remember the precise distinguishing. That's all right. But if the court please, this court on page 11 said that there was a genuine issue regarding the proper amount of compensatory damages to be awarded in the conversion count. We have no question about that. There was a conversion. Was there $35,000, or does he get his trust back? On the attorney's fees, the cases are replete. There are countless cases, no attorney's fees and conversion. Now, going to this issue of why we filed the appeal in the first place, we filed the appeal in the first place because this court said that the case should be returned to the trial court for a ruling on the proper amount of compensatory damages on the conversion count. And we reversed the summary judgment with reference to the amount of compensatory judgments. That's page 11. Finally, because exemplary damages are not properly awarded in the absence of compensatory damages, citing this Hayman case, we find numerous disputed issues of fact with respect both to the propriety and amount of exemplary damages. We reversed the summary judgment with respect to the issue of those damages. There was no judgment entered on the contract count in this court's opinion. That's why Judge Harrison said when Mr. Boyle raised the issue, there is no judgment in this court on the contract count upon which the attorney's fees could have been based. And I believe you continue, quote, to have a judgment in count 1, 2, and 2, that's the contract counts, for $0.00 and 0 cents. And I believe if you desire to take that question up, you should have filed an appeal at that time. So we only came back on the conversion count. Now, as a condition of those trucks, the trucks that cast and put on the Silver Hostel when they were shipped from South Carolina were damaged in a 90-mile-per-hour derailment. They came down, the Feather River people come, with two inspectors, McNair and McVeigh, McNair and Morgan, and they say those 90-mile-per-hour derailed trucks appear to be in good condition. Caston knew that. Caston and his expert witness Moore, who testified at trial, said that they would have required more than $50,000 worth of repair work. So what Caston did and notified them a month ahead of time, and this goes to the issue of punitive damages, but this conversion has been found. What he did, he notified them by fact that he was going to move the Silver Hostel onto trucks which were identical to California's separate trucks, and those were the trucks that were going to be used and were, in fact, used to transport the tower to California. So the trucks that are sitting in California are, from his point of view, and he's been in this business a long time, identical to the California's separate trucks that were manufactured for that car when it was originally manufactured. They're sitting in California, there's nothing wrong with them, they're identical California's separate trucks, and it would have been absurd for him to try to ship the trucks, the car, the Silver Hostel to California on the trucks which were sitting under it at the time, which they said were in good shape, and they'd been devastated in this derailment. It would have cost a few thousand dollars. Question, did the derailment occur while the trucks were on the Silver Hostel? No. Okay, so after they were damaged, they were put on the Silver Hostel. Yeah, there was a temporary thing in which he just placed it. You've got to put the car on something. So when he comes from Denver, he has those damaged trucks in there, he sets them on them, and then this all happens. And then a month before, this whole deal occurs. He says by fax, and nobody disputes that fax was received, that we have to or we're going to switch the car over to the Silver Dollar trucks, identical silk California separate trucks. Again, this goes to the issue of pitted damages, and I don't care one bit on the issue of attorney's fees on conversion. Can I ask you on those attorney's fees again? In the original judgment that came from the trial court, I think the compensatory damages were about $75,000. Yeah, but it was include the cost of replacing, of switching over those trucks. It included that and attorney's fees. Yes, and attorney's fees. So in the original judgment, it included as compensatory damages attorney's fees. And it was not disputed in the original appeal that it could not. Well, when Judge Moran ruled on that, he ruled on a motion for summary judgment which was presented him cold without me being there with five motions pending. I don't know how he did it, but however he did it, he included attorney's fees in the compensatory damages. Yes. And then he remanded it to determine compensatory damages. Yes, on conversion. Well, it wasn't a dispute in the original appeal, I take it, or we would have taken it up in the Rule 23. Well, it was a dispute because contract. Was it a dispute that the attorney's fees were awarded under the conversion count as opposed to the contract count? Well, they were just in the original decision. They were awarded on a summary judgment, okay, and they were simply awarded to the plaintiff. Under what count they were awarded, I don't know, but I know the contract counts are gone now. And this Court has said this case is to be returned here on trial of the actual damages in the conversion count. And as I say, well, me and Dick don't need to – Dick and I don't need to apologize, but this case became very, very convoluted, and there are very, very many complexities to it, which unfortunately have lasted over 11 years. I might say in passing at the end, I made an offer approved for my fees, and where that was turned, I couldn't even make an offer approved, you know. So that's the way it goes. Thank you, Mr. King, Mr. Boyle. Thank you both for your briefs and your arguments. So we're going to take this matter under advisement, and we'll issue our decision in due course.